**Ralph GAUSVIK, Plaintiff,**

v.

**Robert Ricardo PEREZ, individually, and in his official capacity; et al., Defendants.**

**No. CS–01–071–AAM.**

United States District Court, E.D. Washington.

Sept. 16, 2002.

---

John S. Stocks, Van Siclen Stocks & Firkins, Auburn, WA, Robert Craig Van Siclen, Tyler K. Firkins, Van Siclen Stocks & Firkins, Auburn, WA, for Ralph Gausvik.

Patrick G. McMahon, Carlson McMahon & Sealby PLLC, Wenatchee, WA, for Robert Ricardo Perez.

Patrick G. McMahon, Carlson McMahon & Sealby PLLC, Wenatchee, WA, for Kenneth J. Badgley, Earl Tilley, City of Wenatchee, Wenatchee Municipal Police Dept.

Stanley Allen Bastian, Jeffers Danielson Sonn & Aylward PS, Wenatchee, WA, for Chelan County.

Joel E. Wright, Lee Smart Cook Martin & Patterson PS, Seattle, WA, for Barker & Howard PS Inc., Jeffrey Barker, Keith Howard.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, *INTER ALIA*

MCDONALD, Senior District Judge.

**BEFORE THE COURT** is the Motion of defendants Perez, Badgley, Tilly and City of Wenatchee for Summary Judgment (Ct.Rec.117)[1]; plaintiff's Motion for Partial Summary Judgment (Ct.Rec.130); plaintiff's Motion for Rule 56(g) Sanctions and/or Order on Contempt (Ct.Rec.202); and plaintiff's Motion to Supplement Summary Judgment Response.

Per LR 7.1(h)(3) the court has exercised its discretion to consider all of these motions without oral argument.

## I. BACKGROUND

Defendant Robert Perez of the City of Wenatchee Police Department was the lead investigator in what became known as the "Wenatchee Sex Ring" cases. His investigation led to the arrest of plaintiff Ralph Gausvik.

On November 2, 1995, a Chelan County jury found plaintiff guilty of six counts of rape of a child and child molestation. In January 1998, the Washington Court of Appeals reversed plaintiff's convictions on two of the counts, but affirmed on the remaining counts. On November 18, 1998, plaintiff was resentenced to a term of imprisonment of 260 months.

In June 2000, pursuant to a personal restraint petition filed by plaintiff, the Washington Court of Appeals remanded the matter to the Chelan County Superior Court for a reference hearing to determine the reliability of the victims' accusations. The matter was specifically remanded to Hon. Wallace Friel, a Whitman County Superior Court Judge. The State thereafter voluntarily dismissed all of the charges against Mr. Gausvik because Judge Friel had made findings in previous reference hearings in other cases that Perez had improperly interviewed alleged abuse victims. The State therefore, believed it could not prevail in Mr. Gausvik's case.

After the charges against him were dismissed, Gausvik commenced the suit which is now before this court. This suit alleges violations of plaintiff's federal constitutional rights under 42 U.S.C. § 1983. It also alleges various state law tort causes of action. Named as defendants are: Robert Perez, Kenneth J. Badgley, Chief of the Wenatchee Police Department during the relevant time, Earl Tilly, Mayor of the City of Wenatchee and Director of the Public Safety Committee at the relevant time, City of Wenatchee and Wenatchee Municipal Police Department. By previous order of the court, summary judgment was granted in favor of defendants Chelan County, Barker & Howard, P.S., Inc., and Jeffrey Barker and Keith Howard, the principals of Barker & Howard. Those defendants are no longer part of this litigation.[2]

---

[1]. Defendants' Motion to File an Overlength Brief in support of its summary judgment motion (Ct.Rec.115) is GRANTED as is plaintiff's Motion to File an Overlength Brief in response to said motion (Ct.Rec.167).

[2]. The court's summary judgment order did not direct the District Executive to enter a judgment because not all of the defendants and claims had been disposed of and the

## II. FACTS

Robert Ricardo Perez ("Perez") is a sixteen year law enforcement veteran. For the past thirteen years he has served the City of Wenatchee as a police officer.

Kenneth C. Badgley, at all material times to this lawsuit, was the Chief of the Wenatchee Police Department, having served as chief since September 1978.

Earl F. Tilly, at all material times to this lawsuit, was the Mayor of the City of Wenatchee, serving as director of the city's Public Safety Committee.

On January 1, 1994, Perez was appointed to the Detective Unit of the Wenatchee Police Department. He was assigned to be the detective in charge of crimes against persons which included investigation of child abuse, both physical and sexual abuse. This was a two year rotational assignment and on December 31, 1995, Perez went back to being a patrol officer.

Perez received some training in child sex abuse investigations. He attended a three day, twenty-one hour seminar put on for the prosecutors and law enforcement personnel in Wenatchee from December 1, 1993 to December 3, 1993. In May 1994, Perez attended the five day, forty hour Washington State Criminal Justice Training Course on investigating child abuse.

On or about March 13, 1995, Perez and Washington Child Protective Services (CPS) worker Kate Carrow drove Perez's foster daughter, Donna Everett, through Wenatchee and East Wenatchee. Everett identified plaintiff's home as one of the homes in which she claimed she had been sexually abused. Everett stated that plaintiff Gausvik and his wife, Barbara Garaas, had sexually abused her, as well as their own children.

Ralph Gausvik and Barbara Garaas are the father and mother of three children: Troy W. Garaas, Delilah Garaas, and Christa Garaas. Barbara Garaas is also the mother of another child, Travis V. Garaas, who lived with his mother and Ralph Gausvik. Gausvik is not the biological or adoptive father of Travis.

On May 30, 1995, Perez and Carrow went to the elementary school attended by Delilah, age 5 at the time. Perez and Carrow interviewed Delilah. Delilah did not make any allegations of abuse by her father at this time.

Following the interview with Delilah, Perez and Carrow went to the home of Ralph Gausvik and Barbara Garaas. The Garaas children were taken into CPS protective custody and placed with foster parents.

On June 5, 1995, Troy Garaas, then twelve years old, was taken out of his elementary school by Perez and Carrow and interviewed at the CPS office. During this interview, Troy related sexual abuse by his mother and father.

On June 6, 1995, Carrow and CPS filed Dependency Petitions relating to Travis, Troy and Delilah Garaas.

On June 12, 1995, Carrow interviewed fifteen year old Travis Garaas. Travis denied any abuse by his mother or Ralph Gausvik.

On June 29, 1995, Troy and Travis Garaas were taken to James Jantzen, M.D., for physical examinations. Both boys denied to Dr. Jantzen that they had been sexually abused.

On July 5, 1995, Delilah Garaas was taken to Dr. Jantzen for a physical exami-

court did not certify a final judgment pursuant to Fed.R.Civ.P. 54(b). Nonetheless, a judgment was entered on the prior order granting summary judgment to Chelan County, Barker & Howard, Jeffrey Barker and Keith Howard. The court will direct that judgment be vacated because it was prematurely entered.

nation. She told Dr. Jantzen she had not been abused by her parents.

Dr. Jantzen reported that his physical examination findings of all three children were "suggestive" of sexual abuse.

In early July 1995, Travis Garaas was interviewed by Douglas County detectives. He did not make any statements that he had been sexually abused by his mother or Ralph Gausvik.

On July 7, 1995, Perez arrested Ralph Gausvik and on July 8, the Chelan County Superior Court found probable cause for Gausvik's arrest.

On July 15, 1995, Chelan County Deputy Prosecutor Roy Fore filed a criminal information against Gausvik alleging rape of a child in the first degree and child molestation in the first degree perpetrated against Troy Garaas.

On August 16, 1995, Travis and Delilah were interviewed. In attendance at the interview were Perez, Carrow and Fore. Each of the children made statements that they had been sexually abused by Barbara Garaas and Ralph Gausvik.

On September 15, 1995, the Chelan County Prosecutor amended the criminal information against plaintiff to include counts that plaintiff had sexually abused Travis and Delilah.

On October 31, 1995, Travis Garaas testified at plaintiff's criminal trial that he had been sexually abused by the plaintiff.

On November 1, 1995, Troy and Delilah Garaas testified at the plaintiff's criminal trial that they had been sexually abused by the plaintiff.

On November 2, 1995, a jury convicted plaintiff on all six counts of child molestation and rape of a child.

On December 1, 1995, the Chelan County Juvenile Court entered Orders of Dependency finding that Travis, Troy and Delilah were abused or neglected by a person legally responsible for their care.

On December 21, 1995, the plaintiff was sentenced to 280 months imprisonment.

On March 31, 1997, the Chelan County Superior Court held a hearing on the termination of the plaintiff's parent/child relationship as it applied to Troy, Delilah and Christa Garaas. The court found in each case that there was clear, cogent and convincing evidence of sexual abuse. Plaintiff's parental rights were terminated.

In January 1998, the Washington Court of Appeals reversed plaintiff's convictions on the two counts relating to Troy, but affirmed the convictions on the other four counts relating to Travis and Delilah.

On November 18, 1998, plaintiff was resentenced to a term of imprisonment of 260 months.

In June 2000, pursuant to a personal restraint petition filed by plaintiff, the Washington Court of Appeals remanded the matter to the Chelan County Superior Court for a reference hearing to determine the reliability of the victims' accusations.

On June 28, 2000, Chelan County Prosecutor Gary Riesen and plaintiff's attorney stipulated to an order dismissing plaintiff's personal restraint petition and providing for the immediate release of plaintiff from confinement based on Chelan County's dismissal of all criminal charges against plaintiff.

## III. DISCUSSION

### A. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Under Fed. R.Civ.P. 56, a party is entitled to summary

judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other ele-

ments of the claim. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

**B. 42 U.S.C. § 1983–Federal Constitutional Claims**

 § 1983 provides a mechanism for seeking redress for an alleged deprivation of an individual's federal constitutional and statutory rights by persons acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). There is no dispute that the actions taken by the officers in this case were "under color of state law." [3]

Plaintiff alleges defendants violated his Fourth, Fifth, Sixth, Eighth And Fourteenth Amendment rights, including the right to freedom from unreasonable search and seizure of his person and property, freedom from the deprivation of his liberty and property without due process of law, right to a fair trial and right to compulsory process. Plaintiff also alleges that defendants conspired to violate his civil rights in violation of 42 U.S.C. § 1985(3).[4]

**1. Collateral Estoppel/Judicial Estoppel**

Defendants contend plaintiff is collaterally estopped from arguing he did not abuse Travis, Troy and Delilah because of the Orders of Dependency entered on De-

---

**3.** Plaintiff says he is suing Perez, Badgley and Tilly in their individual and official capacities. Naming a government official in his official capacity is the same as naming the governmental entity itself as the defendant and requires the plaintiff to prove an official policy or custom is the cause of the constitutional violation. *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Here, the City of Wenatchee is named as a defendant. Naming both the city and the individual officers as defendants in their official capacities is redundant.

**4.** On November 20, 2001, this court entered an order allowing plaintiff to file a First Amended Complaint. It is not clear, however, whether plaintiff in fact filed his First Amended Complaint. If he has not done so, he should do so forthwith. It is apparent that defendants have filed their summary judgment motion based on the contents of the First Amended Complaint which alleges certain state law causes of action which were not alleged in the original complaint.

cember 1, 1995 by the Chelan County Juvenile Court and the findings of the Chelan County Superior Court entered on March 31, 1997 in conjunction with the termination of plaintiff's parental rights regarding Troy and Delilah.

■ Defendants rely on *Miles v. State, Child Protective Services*, 102 Wash.App. 142, 6 P.3d 112 (2000), review denied, 142 Wash.2d 1021, 16 P.3d 1266 (2001).[5] In *Miles*, the parents of three children filed a complaint alleging they were wrongfully separated from their children. The complaint alleged violation of 42 U.S.C. § 1983, negligent investigation, negligent infliction of emotional distress, negligent diagnosis and outrage. Fifteen months prior to filing their complaint, the parents had agreed to and signed an "Agreed Order of Dependency" entered by Pierce County Superior Court. The superior court concluded the children were dependent pursuant to RCW 13.34.030(4)(b).

The Washington Court of Appeals found the parents were precluded from claiming their children were not abused or neglected:

> Collateral estoppel precludes a party from relitigating an issue of fact that the party has already litigated to final judgment, so long as injustice does not result. A key issue of fact in the dependency action was whether the Miles had abused or neglected their children prior to December 5, 1994. The dependency court resolved that issue by entering a judgment that was final and appealable. In that judgment, it ruled that the children were dependent within the meaning of RCW 13.34.030(4), which is equivalent to saying the children were abused or neglected. Assuming without holding that the Miles could attack the trial court's judgment directly (i.e., by motion

made in the dependency action), they may not attack it **collaterally** (i.e., by relitigation in a separate action such as this). For purposes of this case, the Miles are bound to the proposition that their children were abused or neglected in 1994.

*Id.* at 153, 6 P.3d 112 (emphasis in text).

Regarding their § 1983 claim, the parents claimed the defendants had deprived them of a fundamental right to their children's companionship. The court of appeals held "there is no well-established constitutional right to the companionship of children whom one has abused or neglected, and thus made dependent, according to a final and appealable dependency judgment that one agreed to while represented by counsel." *Id.* at 158, 6 P.3d 112. Therefore, the court concluded the parents lacked a valid § 1983 claim against the State of Washington and its caseworker. *Id.*

In a footnote, the court of appeals observed that even if collateral estoppel did not apply, judicial estoppel would. Judicial estoppel precluded the parents from agreeing in open court in the dependency case that their children were abused or neglected, then arguing in open court in their civil rights/personal injury action that their children were not abused or neglected. *Id.*, n. 21.

With respect to the parents' various claims of negligence, the court of appeals found the parents would be unable to establish causation:

> To prove a negligence cause of action, a plaintiff must establish causation. To do that, a plaintiff must produce evidence sufficient to support an inference that the claimed harm would not have oc-

---

**5.** With regard to the collateral estoppel effect of a state court judgment, federal courts apply the law of the state where the judgment was

rendered. *Zamarripa v. City of Mesa*, 125 F.3d 792, 793 (9th Cir.1997).

curred but for the claimed negligence. When the Miles agreed in the dependency court that their children were dependent within the meaning of RCW 13.34.030(4), they agreed that the children were abused or neglected, and it was that abuse or neglect, not the diagnosis of [Munchausen Syndrome By Proxy], that caused the children's removal from the home. Given the evidence here, a rational trier of fact could not infer that the claimed harm (removal of the children from the home and resulting emotional distress) would not have occurred but for the claimed negligence (diagnosis and reporting of [Munchausen Syndrome By Proxy]).

*Id.* at 160, 6 P.3d 112. The court added that the parents' claim for outrage also failed because no reasonable person could find the defendants engaged in outrageous conduct. *Id.*

Dependency petitions regarding Travis, Troy and Delilah Garaas were filed in Chelan County Juvenile Court on June 6, 1995. (Exs. H, I and J to Declaration of Patrick McMahon). Hearings on these petitions were not held until December 1, 1995, after plaintiff had been convicted in Chelan County Superior Court of sexually abusing Travis, Troy and Delilah. Orders of Dependency were entered by the Chelan County Juvenile Court on the same date of the hearings (December 1, 1995).

Plaintiff's conviction was among the "Findings" made by the Chelan County Juvenile Court in concluding the children were dependent. (Exs. K, L and M to Declaration of Patrick McMahon). The "Findings" with regard to Troy and Delilah also included the following:

Although the parents deny that their children were neglected, the parents [Ralph Gausvik and Barbara Garaas] stipulate that, if this matter proceeded to a contested hearing, the Department would present testimony of neglect, including:

a. When the children were placed in care, Delilah's hair was excessively dirty and matted;

b. When the children were placed in care, Christa's teeth were rotting and required extensive dental care; [6]

c. When the children were placed in care, Troy had not been wearing his leg/foot brace and needed surgery for the disability.

A similar finding was made with regard to Travis, but since plaintiff is not the biological or adoptive father of Travis, the finding reflected only that Travis' mother, Barbara Garaas, stipulated that if the matter proceeded to a contested hearing, the Department of Social and Health Services would present testimony of neglect. (Ex. K to Declaration of Patrick McMahon).

The Chelan County Juvenile Court found that Travis, Troy and Delilah had been abused or neglected as defined in RCW 26.44 [7] by a person legally responsible for their care, and had no parent, guardian or custodian capable of adequately caring for them and therefore, concluded the children were dependent pursuant to RCW 13.34.030(4)(b) and (c).

On March 31, 1997, the Chelan County Juvenile Court held parental rights termination hearings regarding Troy, Delilah and Christa Garaas. On April 21, the court entered orders terminating plaintiff's

---

**6.** Christa is the youngest of the children of Gausvik and Barbara Garaas. Gausvik was neither charged or convicted of any sexual abuse with regard to Christa.

**7.** "Abuse or neglect" means the injury, sexual abuse, sexual exploitation, negligent treatment, or maltreatment of a child by any person under circumstances indicating the child's health, welfare and safety is harmed. RCW 26.44.020(12).

parental rights. (Exs. N, O and P to Declaration of Patrick McMahon). The court found that with regard to each of the children, there was clear, cogent and convincing evidence the children had been victims of sexual abuse. The court noted that plaintiff had appealed his criminal conviction and his appeal was currently pending, but found no evidence "regarding the likelihood of success for Mr. Gausvik's appeal of his criminal convictions." The court found because of the fact plaintiff was "a convicted rapist of his children, it is in the best interests of the children to terminate his parental rights as well." Among its "Conclusions of Law" was that as to plaintiff, the allegations under RCW 13.34.180(1)(2)(5) and (6) "have been established beyond a reasonable doubt."

What plaintiff alleges in the litigation before this court is that defendant Perez deliberately fabricated evidence of sexual abuse against the plaintiff which led to his arrest and conviction. Plaintiff's arrest and conviction preceded the Chelan County Juvenile Court's orders on dependency and orders terminating plaintiff's parental rights. The plaintiff could not challenge the fact of his arrest and conviction at either the dependency hearing or the termination hearing. Any such challenge would have been futile. He had to challenge that via direct appeal from his conviction and, if that failed, through collateral proceedings (a personal restraint petition). On direct appeal, he managed to get his conviction on some of the counts reversed in January 1998 (seven months after his parental rights had been terminated) and ultimately, after filing his personal restraint petition, the county prosecutor was persuaded to dismiss the remaining charges against him

in June 2000. June 2000 was four years after the Garaas children had been adjudged "dependent" and over three years after plaintiff's parental rights had been terminated.

What plaintiff "stipulated" to in the dependency proceedings was that "if this matter proceeded to a contested hearing, the Department would present testimony of neglect." Plaintiff did not stipulate that he had in fact neglected his children. Indeed, the findings of the dependency court were that "the parents deny that their children were neglected." Moreover, the evidence of neglect which the parents acknowledged DSHS would present was that they had failed to provide for the hygiene and health care needs of their children, not that they had sexually abused them.

*Miles* is clearly distinguishable from the case at bar. The parents in *Miles* had not been convicted of child abuse at the time of the dependency hearing. There was an "Agreed Order of Dependency" entered in *Miles* which was "expressly agreed to and signed by Mr. Miles and his attorney, and Ms. Miles and her attorney." 102 Wash. App. at 150, 6 P.3d 112. The "signed" parties agreed to the establishment of dependency pursuant to RCW 13.34.030(4)(b) (abused or neglected). Here, plaintiff did not expressly agree to or sign any "Agreed Order of Dependency." He may not have "disputed" the allegations of dependency or presented any evidence or witnesses, but that is of little significance considering he had already been convicted of sexually abusing his children. Disputing the allegations of dependency would have been futile.[8]

In Washington, collateral estoppel applies only when the party seeking

---

8. One of the "findings" by the dependency court was that medical examinations of the children were consistent with sexual abuse. Here again, there is little significance in

plaintiff failing to challenge that finding when he had already been convicted of sexually abusing his children.

estoppel can show that: 1) the issues between the first action and the second action are identical; 2) the parties to be estopped in the second action were parties in the first suit; 3) the first suit resulted in a judgment on the merits; and 4) there would be no injustice if the parties were estopped from relitigating the issues. *Everett v. Perez,* 78 F.Supp.2d 1134, 1136 (E.D.Wash.1999).

Plaintiff is not estopped from asserting in the litigation currently before this court that evidence of sexual abuse was fabricated against him by defendant Perez which led to his arrest and conviction. To preclude him from doing so would "work an injustice" because plaintiff did not have any opportunity, let alone a "full and fair opportunity," to challenge the validity of his conviction in the dependency or the termination proceedings. *Hanson v. Snohomish,* 121 Wash.2d 552, 561, 852 P.2d 295 (1993) (doctrine of collateral estoppel prevents relitigation of an issue after the party estopped has had a full and fair opportunity to present its case).

■ Plaintiff is not judicially estopped from asserting evidence of sexual abuse was fabricated against him. Defendants claim it would be "completely inconsistent to allow Mr. Gausvik to disavow child abuse which he acknowledge[d] in the previous dependency proceedings." As explained above, plaintiff did not expressly and volitionally acknowledge at either the dependency or termination hearings that he had sexually abused his children. Therefore, it is not inconsistent for him to assert in this litigation that he did not sexually abuse his children and that evidence of such abuse was fabricated against him.

## 2. Statute of Limitations Re § 1983 False Arrest Claim

■ Defendants assert that plaintiff's § 1983 false arrest claim is time-barred because it was not brought within three years after the date of plaintiff's warrantless arrest on July 7, 1995. Washington's three year personal injury statute of limitations, RCW 4.16.080(2), applies in § 1983 actions. *Rose v. Rinaldi,* 654 F.2d 546, 547 (9th Cir.1981).

Defendants acknowledge the holding in *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), that when allowing recovery of damages would necessarily imply the invalidity of a conviction or sentence, a § 1983 plaintiff must demonstrate that his or her conviction has been reversed, vacated, or otherwise called into doubt before he or she can proceed under § 1983. Defendants contend, however, that plaintiff did not need to wait until all of the charges against him were dismissed in June 2000 before bringing his claim for false arrest in the original complaint filed in this court in March 2001. Defendants say this is because "additional evidence surfaced after the plaintiff was arrested, in the form of statements made by the Garaas children which implicated the Plaintiff" (presumably referring to the statements made by Travis and Delilah Garaas during their August 16, 1995 interviews). In *Heck,* the Supreme Court stated that if a § 1983 action for damages will not demonstrate the invalidity of the conviction or sentence, the claim accrues at the time of the event in issue, and the action should be allowed to proceed in the absence of any other bar to the suit. 512 U.S. at 487, 114 S.Ct. 2364.

■ Although state law determines the applicable statute of limitations on a § 1983 claim, federal law determines when a cause of action begins to run on such a claim. *Cabrera v. City of Huntington Park,* 159 F.3d 374, 379 (9th Cir.1998). In *Cabrera,* the plaintiff's conviction for disturbing the peace was ultimately invalidated. The plaintiff's civil suit included a

claim for false arrest which the defendants argued was barred by California's one year limitation period measured from the time of plaintiff's arrest. The Ninth Circuit held the false arrest claim did not accrue until the plaintiff's conviction for disturbing the peace was invalidated. It reasoned that any finding in a civil suit that the police lacked probable cause to arrest the plaintiff would have necessarily implied plaintiff's conviction was invalid and accordingly, the civil determination had to wait until the conclusion of criminal proceedings. *Id.* at 380. *Cabrera* recognized, however, that each case must be examined on its own facts and notwithstanding *Heck*, a false arrest claim could, in some circumstances, still accrue upon a person's arrest. *Id.*, n. 7.

Any finding that Perez lacked probable cause to arrest the plaintiff on July 7, 1995 would necessarily imply that plaintiff's convictions for sexually abusing Travis, Troy and Delilah were invalid. The question of whether Perez had probable cause to arrest plaintiff on July 7, 1995 goes to the heart of the criminal convictions against plaintiff, four of which remained in effect until June 2000. Plaintiff asserts Perez did not have probable cause to arrest him for sexually abusing his children. Plaintiff was convicted of sexually abusing

his children. Had plaintiff brought a § 1983 suit for false arrest on or before July 7, 1998 (within three years after his arrest), he would have been collaterally attacking criminal convictions which had not yet been invalidated. This is precisely what *Heck* forbids. Plaintiff's § 1983 false arrest claim accrued in June 2000, not on the date of his arrest (July 7, 1995).[9] Accordingly, plaintiff's § 1983 false arrest claim, as first asserted in the original complaint filed in March 2001, is not barred by the applicable three year statute of limitations.

### 3. Effect of Plaintiff's Conviction on Ability to Assert § 1983 Claims Regarding Probable Cause to Arrest and Prosecute

█ In *Hanson v. Snohomish*, 121 Wash.2d at 560, 852 P.2d 295, the Washington Supreme Court held that "a conviction, although later reversed, is conclusive evidence of probable cause, unless that conviction was obtained by **fraud, perjury, or other corrupt means** ...." (emphasis added). Defendants contend that plaintiff's conviction by a jury, even though later reversed, establishes probable cause as a matter of law and vitiates his § 1983 claims premised on lack of probable cause, as well as his state law claims for false

9. Plaintiff's conviction for sexual offenses relating to Troy were invalidated by the Washington Court of Appeals in January 1998. *State v. Ralph Vernon G.*, 90 Wash.App. 16, 950 P.2d 971 (1998). Plaintiff's conviction on the charges related to Delilah and Travis were affirmed by the court of appeals and not dismissed until June 2000. Nonetheless, plaintiff's § 1983 false arrest claim did not accrue until June 2000. Plaintiff was initially charged only with offenses against Troy. (See Information filed July 12, 1995, Defendants' Ex. B to Declaration of Patrick McMahon). The information was amended subsequently so that in September 1995, plaintiff was also charged with offenses against Delilah and Travis. (Ex. F to Declaration of Patrick McMahon). Perez's July 8, 1995 probable cause affidavit, filed the day after plaintiff's arrest, alleged eight victims of sexual abuse, including Delilah and Travis. Therefore, defendants could not make a compelling argument that the false arrest claim accrued in January 1998 when plaintiff's convictions relating to Troy were invalidated. If the claim accrued in January 1998, the statute of limitations would have expired in January 2001, approximately two months before plaintiff filed his original complaint in this court. Plaintiff asserts he was falsely arrested not only for alleged sexual offenses against Troy, but also for offenses against Travis and Delilah.

arrest, false imprisonment, and negligent investigation. Defendants assert that plaintiff's conviction was not obtained through fraud, perjury or other corrupt means.

In *Hanson,* the plaintiff's § 1983 claim was "predicated on [his] claim that he [had] a constitutional right to be free from malicious prosecution, false arrest and false imprisonment ...." *Id.* at 564, 852 P.2d 295. Because these underlying claims were unsupported, the court reasoned that the federal claim should also be dismissed. *Id.*

In *Fondren v. Klickitat County,* 79 Wash.App. 850, 860, 905 P.2d 928 (1995), the Washington Court of Appeals observed that the U.S. Supreme Court's determination in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), did not repudiate the rule announced in *Hanson* and "never conclusively addressed the effects of a prior conviction on the question of probable cause." The court of appeals therefore declared the question "unresolved under federal law." *Id.* In *Fondren,* the court of appeals found that an allegation that evidence favorable to the plaintiff was not discovered, or was lost, destroyed, or rendered unusable, arguably supported a claim or claims involving plaintiff's Fourth Amendment rights, "**unrelated** to the malicious prosecution, false arrest, and false imprisonment claims." *Id.* at 860–61, 905 P.2d 928 (emphasis added). Therefore, the court of appeals concluded plaintiff's § 1983 claim should not have been dismissed. *Id.* at 861, 905 P.2d 928.

Here, plaintiff's alleged federal constitutional violations unrelated to the existence of probable cause are not impacted by the rule in *Hanson,* but his claims which are related to the existence of probable cause apparently must overcome the hurdle established in *Hanson.* This court has not found any federal or state case suggesting otherwise.

Plaintiff contends that in his case, the Washington Court of Appeals "all but found there was no probable cause" in its "Order Remanding Personal Restraint Petition For Reference Hearing" filed June 5, 2000. The court of appeals, however, did not make a specific finding that there was a lack of probable cause. All it found was that plaintiff had satisfied the prerequisites for a reference hearing:

> In [Gausvik's] petition, he points out that none of the accusations against him were made before Detective Perez interviewed the children. The first allegation against him came from D.E. [Donna Everett], Detective Perez's foster daughter, who identified Mr. Gausvik's home, along with 24 others, as a place where abuse had occurred. This court has already recognized D.E.'s unreliability in its granting of Harold and Idella Everett's and Manuel Hidalgo–Rodriguez's personal restraint petitions.
>
> As to the allegations made against Mr. Gausvik by his children, he points out that they all initially denied abuse, then made certain accusations, followed by more accusations of multiple acts of abuse by an increasing number of persons. And, even after Detective Perez elicited the allegations from the children, Mr. Gausvik contends they reverted to their original denials of abuse when persons other than Detective Perez questioned them. For example, one of the children, T.G. [Travis Garaas], told another defendant's attorney that Detective Perez would not accept his statement that his father had not abused him. Detective Perez told him he knew Mr. Gausvik had molested him, and made it clear he wanted T.G. to confirm that abuse had occurred .... Other evidence of Detective Perez's improper tac-

tics is contained in Mr. Gausvik's declaration and that of the children's mother, Barbara [Garaas], both filed in this petition.

(Plaintiff's Ex. 141 at pp. 2–3).

In a footnote, the court of appeals added:

> The court views the foregoing reports in the context of newly discovered evidence that Detective Perez routinely used improper interview tactics with other children who were allegedly victims of sexual abuse. In a reference hearing conducted in the personal restraint petitions of Harold and Idella Everett, the court found Detective Perez regularly used a threatening tone, accused child witnesses of lying when they denied abuse, confronted children with 'disclosures' made by other children, including siblings, asked the same question over and over to children until he obtained an answer he desired, used leading questions and drafted his reports to make them look as though he had not used leading questions.

(Plaintiff's Ex. 141 at p. 3, n. 1).

Of course, there was no subsequent reference hearing in Mr. Gausvik's case because the Chelan County Prosecutor, shortly after the remand from the court of appeals, stipulated to a dismissal of all the charges against Gausvik.[10] While the order of remand from the court of appeals cannot be considered a finding of a lack of probable cause, the evidence discussed therein, and submitted by plaintiff in opposition to defendants' motion for summary judgment in this case (discussed *infra*),

raises a genuine issue of material fact whether Gausvik's conviction was obtained by "fraud, perjury, or other corrupt means." [11] More specifically, there is a genuine issue of material fact whether Perez deliberately fabricated evidence against Gausvik by using investigative techniques that were so coercive and abusive he knew or should have known those techniques would yield false information about Gausvik.

### 4. Individual Liability—Perez

#### a. Fabrication of Evidence

██ Plaintiff's constitutional claims boil down to an allegation of "deliberate fabrication of evidence" by defendant Perez: fabrication of evidence to establish probable cause for plaintiff's warrantless arrest and fabrication of evidence to obtain his conviction. *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir.2001), is another § 1983 action arising out of the "Wenatchee Sex Ring" investigation. In that case, the Ninth Circuit (en banc) stated there is a "clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074–75. In order to support a claim for deliberate fabrication of evidence, a plaintiff must, at a minimum, produce evidence that supports one of the following propositions: (1) the defendants continued their investigation of an individual despite the fact that they knew or should have known he was innocent; and (2) defendants used investigative tech-

---

**10.** In so doing, the Chelan County Prosecutor noted that in previous reference hearings involving the personal restraint petitions of Harold and Idella Everett and Manuel Hidalgo Rodriguez, Judge Friel had found that Perez had improperly interviewed victims and the court of appeals had subsequently adopted his findings in reversing the convictions of the Everetts and Rodriguez. (Plaintiff's Ex. 139).

**11.** Indeed, defendants admit in their reply brief that although they "vehemently deny the factual allegations the Plaintiff offers in support of the proposition regarding fraud, perjury, or other corrupt means, it is obvious that engaging in a fact-for-fact determination would effectively defeat summary judgment in this case." (Reply Br. at pp. 12–13).

niques that were so coercive and abusive that they knew or should have known those techniques would yield false information. *Id.* at 1076.

 At the same time, the circuit was persuaded that there is no constitutional right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out a particular way. *Id.* at 1075. According to the circuit:

> Interviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law—constitutional, decisional, or statutory—that indicates precisely where the line must be drawn.

*Id.*, citing *Myers v. Morris*, 810 F.2d 1437, 1460–61 (8th Cir.1987). Thus, "mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as a basis for a claim under § 1983." *Id.*

The Ninth Circuit added:

> [I]nterviewers of child witnesses of suspected sexual abuse must be permitted to exercise some discretion in deciding when to accept initial denials at face value and when to reject them (or withhold judgment on them) and proceed further. Consequently, an allegation that an interviewer disbelieved an initial denial and continued with aggressive questioning of the child cannot, without more, support a deliberate-fabrication-of-evidence claim, even if the allegation is amply supported by the evidence. What is required is an allegation or a showing that the interviewer knew or should have known that the alleged perpetrator was innocent, or that the interview techniques employed were so coercive and abusive that the interviewer knew or should have known that they would yield false information.

*Id.* at 1077.

In *Devereaux*, the district court granted the summary judgment motion of the defendants and Devereaux appealed. Pursuant to a settlement agreement, Devereaux's appeal with respect to Perez and Badgley was dismissed with prejudice. The Ninth Circuit did not have to determine whether there was sufficient evidence to support a deliberate fabrication claim against Perez. The only matter on appeal was Devereaux's challenge to the grant of summary judgment in favor of Linda Wood, Timothy Abbey, Laurie Alexander and Kate Carrow, all of whom were Washington Department of Social and Health Services (DSHS) employees. The Ninth Circuit affirmed the grant of summary judgment to these defendants. In doing so, the circuit made several observations.

The circuit observed that repeated admonitions to a child to be truthful cannot amount to deliberate fabrication of evidence in the absence of independent allegations or evidence that the interviewer knew or should have known the accused was innocent and that the child, in testifying to that effect (at one point denying she was a victim of abuse and then later changing her story), had already told the truth. 263 F.3d at 1077.

In *Devereaux*, the plaintiff argued the defendants held an animus and preconception against him which led to their intentional manipulation of child witnesses. The circuit found the "animus and preconception" referred to could just as well have been defendants' good-faith belief the plaintiff was guilty, "which could lead to aggressive or manipulative questioning of the child witnesses in order to get them to testify truthfully, if reluctantly, to his guilt." The circuit therefore concluded that plaintiff's deliberate fabrication of evi-

dence claim could not be based on any allegation that defendants knew or should have known he was innocent. *Id.* at 1078.

Devereaux pointed out that Carrow was involved in the "parade of homes," an incident in which one of Devereaux's foster children was driven around Wenatchee and asked to point out the locations at which abuse had occurred. The Ninth Circuit stated that "driving a child around the community and asking where the crimes that the child allegedly witnessed took place is surely not such a coercive and abusive technique that Carrow should have known it would lead to false information." *Id.* at 1079.

The circuit found use of a parent's confession in questioning the parent's child did not amount to the use of an investigative technique that is so coercive or abusive that a person would actually know or should know it would yield false information. *Id.* The circuit also found that truthfully informing a witness about another witness' corroboration is not such an inherently coercive or abusive technique that a person would actually know or should know it would lead to false information. *Id.* at 1081.

In the case at bar, the first allegation of sexual abuse against Gausvik was made by 10 year old Donna Everett (D.E.) on March 13, 1995. Perez was Donna's foster parent. Donna had been placed in Perez's home in March 1994. On March 13, 1995, Donna drove with Perez and two CPS caseworkers to "various locations where Donna claimed to have been sexually abused, along with other children, by numerous adults over a period between approximately January of 1988 and March 23, 1994." One of the locations identified by Donna was the home of Ralph Gausvik and Barbara Garaas. (Plaintiff's Ex. 3). In his March 31, 1998 "Memorandum Deci-

sion On Reference Hearing" in *State of Washington v. Harold Everett* and *State of Washington v. Idella Everett* [12], Hon. Wallis W. Friel noted issues concerning Donna's credibility ("known that at age 10, at the time of her initial allegations, Donna Everett had an I.Q. of 72 and a mental functioning level of a child 6 [and 1/2] years old") and the concern arising from her relationship with her foster father Perez who was the lead investigator in the sex ring cases ("did not check on Donna's reliability when she began making far-reaching allegations ...."). (Plaintiff's Ex. 33 at pp. 20–26).

In her May 30, 1995 interview by Perez and CPS worker Carrow, Delilah Garaas denied any abuse by her parents, although Perez's report indicates Delilah stated that her mother had told her not to talk about touching of private parts. Furthermore, according to Perez's report, Delilah indicated she had witnessed the Everett children (Donna, Melinda, Erick and Shawn) being sexually abused by their parents (Harold and Idella Everett). (Plaintiff's Ex. 4).

After this interview, Perez and Carrow went to the Gausvik/Garaas residence. Barbara Garaas says Perez accused her of sexually abusing her kids as well as other kids. Despite her denial of abuse, Garaas said Perez told her that "little girls don't lie" and encouraged Garaas to confess in order to get help and avoid prison. (Plaintiff's Ex. 135).

In a declaration dated June 10, 2002, Travis Garaas, who was at home on May 30, 1995 when Perez and Carrow arrived, claims Perez came into his room and "told me he wanted to talk about the fact that I was being molested." Travis says he denied this statement but that:

---

**12.** Harold and Idella are the parents of Donna.

Perez didn't accept my denial. He continued to demand that I admit that I was being abused by my parents. He told me that he knew I was being abused, and that it wasn't my fault. I told him again that he was wrong. Perez made it clear that I was supposed to agree with him. He started to get angry with me, and he got red in the face. He called me a liar. I started to get scared .... I kept denying my parents had done anything to me, or my brother and sisters, but he wouldn't leave me alone. He kept bullying me for about 15–20 minutes. I could tell he was mad when he left the room.

(Declaration of Travis Garaas at pp. 2–3). Interestingly, however, in a deposition taken on July 22, 2002, Travis testified that all he remembered was Perez coming into his room and telling him he was going to be taken into "custody" (foster care). (Ex. A to Supplemental Declaration of Patrick McMahon at pp. 58–60). All three of the children, Travis, Troy, and Delilah, were taken into CPS protective custody on May 30, 1995.

Troy Garaas suffers from cerebral palsy. He was eleven years old at the time of Perez's investigation and functioning at the level of a five year old. He was "mildly to moderately delayed." (Plaintiff's Ex. 76, Jantzen Depo. at pp. 21–22). Perez and Carrow picked up Troy at his school and brought him to the CPS office for an interview on June 5, 1995. During that interview, Troy alleged he had been sexually abused by both his mother and father. The interview lasted two hours. Carrow's notes indicate that Troy asked for a break but it was "denied" because he was drinking a pop. After the interview was completed, Perez and Carrow took Troy to McDonald's for lunch. (Plaintiff's Exs. 4

and 75).[13] In his report, Perez states he asked Troy if he wanted a break and Troy declined the offer (Ex. 4 at p. 8).

Travis was interviewed by CPS caseworkers Carrow and Tim Abbey on June 12, 1995. Perez was not present. During this interview, Travis made no allegations of sexual abuse by his mother and/or Ralph Gausvik. (Plaintiff's Exs. 7 and 27). In his incident report of May 30, 1995, Perez stated that Travis, during his June 12 interview with Carrow and Abbey, "name[d] various adults who sexually abused him and corroborate[d] many of Troy Garaas's statements to me." (Plaintiff's Ex. 4 at p. 11). While plaintiff asserts that Perez's statement about corroboration is false, Perez did not say that Travis corroborated Troy's June 5, 1995 statement that he had been sexually abused by his mother (Barbara Garaas) and his father (Ralph Gausvik). In his recent deposition (Ex. B to Supplemental Declaration of Patrick McMahon at pp. 217–220), Perez testified that Travis had corroborated Troy in certain respects, including statements Travis made regarding the Everetts, statements concerning the church the two boys attended, statements about a man named "Phillipe" or "Felipe," and statements about problems at home when Barbara Garaas and Ralph Gausvik consumed alcohol. Based on this court's review of Carrow's notes from the June 12 interview of Travis (Plaintiff's Ex. 7) and her notes from the June 5 interview of Troy, it appears that in certain respects, Travis did corroborate Troy.

Travis also made no allegations of sexual abuse by his mother and/or Ralph Gausvik when he was interviewed by Douglas County sheriff's deputies on July 8, 1995. (Plaintiff's Ex. 28). The report from the

---

**13.** Ex. 4 is Perez's incident report dated May 30, 1995. Ex. 75 is Carrow's notes from the June 5, 1995 interview with Troy.

Douglas County Sheriff's office does not indicate that Travis was specifically asked about abuse by his mother and/or Ralph Gausvik and indeed that may have been intentional since his mother and Ralph Gausvik resided in Chelan County.

Troy, Travis, and Delilah were all medically examined by James Jantzen, M.D. Troy and Travis were examined on June 29, 1995. Troy denied any sexual abuse by his parents, although Jantzen reported in his "Progress Notes" that Troy "seemed quite hesitant in answering, initially saying 'I don't know' several times and looking at his brother as if wondering what he should say ...." According to Dr. Jantzen, Troy had "a mildly abnormal anal exam with decreased sphincter tone" which was "suggestive but not specific for sexual abuse, specifically rectal penetration." Travis "strongly denied" any sexual abuse. His exam revealed "decreased sphincter tone" which was "suggestive but not specific for sexual abuse, specifically rectal penetration." (Plaintiff's Ex. 136).

Delilah was examined by Dr. Jantzen on July 5, 1995. Jantzen opined that his examination was "consistent with rectal penetration, with large fissures present," but not an acute injury. He added that the vaginal examination was "very suspicious for vaginal penetration as well ...." In his report, Jantzen stated:

[Delilah] divulged to me that she had been abused when questioned. The family, consisting of 2 brothers, 2 sisters, and both parents, live across the street from Harold and Idella Everett, who were implicated in other sexual abuse cases and named the Garaas children as people who had been victimized. Troy, Delilah's older brother, had stated that he witnessed Delilah being abused by the Everetts and also by Delilah's father. Delilah confirmed this to authorities when she was questioned as well, and the children were all removed to foster care with Micki Reyes on May 30. I questioned Delilah about good touch and bad touch, but she did not want to talk to me about this and shook her head in response to all questions. (Plaintiff's Ex. 136).

According to Perez's police report, Troy did indicate during his June 5, 1995 interview that Delilah had been sexually abused by a man named Felipe in the Garaas/Gausvik home, had been abused by Idella Everett, and that "[m]y dad [Gausvik] does stuff to Delilah at home in bed." (Plaintiff's Ex. 4). There is no indication, however, that Delilah had "confirmed this to authorities" on or before July 5, 1995 (date of Dr. Jantzen's examination), particularly that she had been abused by her father (Gausvik).

Plaintiff takes issue with the accuracy of the findings of Dr. Jantzen, offering the Declaration of Joyce A. Adams, M.D. (Plaintiff's Ex. 132). Her declaration was also offered in plaintiff's personal restraint petition proceedings. Adams is an Associate Clinical Professor of Pediatrics at the University of California–San Diego who claims she has "extensive training and experience in identifying the physical signs of sexual abuse in children" and has "previously testified as an expert on this topic." Adams opines that "no significance should be attached to the findings of Dr. Jantzen regarding the anal dilation and venous congestion of the children, as Dr. Jantzen failed to disclose factors relevant to those observations" and "the alleged physical symptoms observed by Dr. Jantzen were either non-existent (no increased size in hymenal opening) or non-specific for sexual abuse (anal dilation, venous congestion)."

Plaintiff also asserts that because of the training Perez received, he should have known that anal dilation is "a non-specific and ... irrelevant finding." Plaintiff,

however, does not point to any evidence that an officer should simply ignore anal dilation. Certainly, the Declaration of Colleen Wilson who instructed the April 1994 Washington State Criminal Justice Training Commission Course on sexual abuse investigation, in which Perez was a participant, does not indicate an officer is to ignore a finding of anal dilation. (See Ex. S to Declaration of Patrick McMahon.)

 Plaintiff asserts Perez "falsified" his May 30, 1995 police report in writing that Jantzen's examinations of Troy and Travis were "positive" for sexual abuse and that the examination of Delilah was "positive for sexual abuse and penetration, both vaginally and anally." In light of Jantzen's findings set forth above, "positive" may be an exaggeration, but a reasonable person would not necessarily be persuaded it is an outright fabrication.[14] Furthermore, Perez indicates he wrote down what had been reported to him by others. Perez wrote as follows:

> On June 5, 1995 ... Delilah and Christa Garaas were examined at Central Washington Hospital in Wenatchee by Dr. James Jantzen .... I contacted Laura Gaukroger at Central Washington Hospital after the examinations were completed to retrieve the films. Ms. Gaukroger advised that the exams of the Garaas girls had been positive for sexual abuse and penetration, both vaginally and anally. I was later advised by Kate Carrow that examinations of Travis and Troy Garaas had also been positive for

sexual abuse, showing signs of anal penetration.

(Plaintiff's Ex. 4 at p. 11).[15]

Plaintiff asserts Perez presented false information to the Chelan County Superior Court on or about July 8, 1995 in support of probable cause to continue holding the plaintiff who had been arrested by Perez without a warrant on July 7. According to plaintiff, this false information included the following: 1) that eight children accused Gausvik of molesting them; 2) that Travis Garaas had been sexually molested; 3) that Troy Garaas had made disclosures in the absence of coercion; and 4) that the children's pediatric sexual abuse exams were "positive" for sexual abuse.

Perez's affidavit of probable cause, which the Chelan County Superior Court relied upon in finding probable cause, stated: "Defendant has been **identified** by at least 8 child victims as having been sexually abused by defendant between 1–1–94[and] 5–1–95" (emphasis added). The affidavit indicates the reader should then look at the "attached report." On the first page of Perez's May 30, 1995 "Incident Report" (presumably the "attached report") is a list of alleged victims of sexual abuse including Troy, Travis and Delilah Garaas, as well as Melinda Everett, Donna Everett, Shawn Everett, and Erik (believed to be Ronnie Everett). Melinda, Shawn and Ronnie are the siblings of Donna Everett. If the youngest Garaas child, Christa, had been included in this list, it would make eight alleged victims of sexual abuse perpetrated by Gausvik. Christa

---

**14.** At his deposition, Jantzen indicated he did not use the term "positive" in his notes because he would have used that term only if his findings were diagnostic of sexual abuse, as opposed to merely "suggestive" of abuse. (Jantzen Depo. at p. 28, Ex. 131).

**15.** Defendants point out that RCW 9A.44.020(1) provides that "it shall not be

necessary that the testimony of the alleged victim be corroborated" in order to convict a person of any crime defined in Chapter 9A.44. All of the crimes of which Gausvik was convicted are defined in Chapter 9A.44. Put another way, medical evidence of sexual abuse is not necessary to convict a person of sexual abuse.

had also been examined by Dr. Jantzen on July 5, 1995 and his findings with regard to her were "[E]xamination consistent with rectal penetration, not in the last few days, however," and "[v]aginal examination, which is probably normal, but cannot absolutely rule out vaginal penetration in the past." (Plaintiff's Ex. 136).

The record indicates that of these eight children, only two had in fact "identified" Gausvik as a perpetrator of sexual abuse as of July 10, 1995: Donna Everett and Troy Garaas. In his "Incident Report" dated March 13, 1995 (Plaintiff's Ex. 3), Perez reported that Donna Everett stated that Barbara Garaas and Ralph Gausvik came over to the Everett house with their children (Delilah, Travis, Troy and Christa) and "the same things happened to them when they came over," referring to sexual abuse. Perez also reported that Donna stated she and her sister went to the Garaas/Gausvik house and "[t]he Garaas mom and dad did the same things to us as they did at my house" and "[t]hey also did this stuff to their kids at their house." (Ex. 3 at pp. 10 and 15). As noted above, Troy, in his June 5, 1995 interview by Perez, indicated he had been sexually abused by his parents. Up to July 10, 1995, both Travis and Delilah Garaas had denied any abuse by their parents. By this time, however, Perez had the medical examinations from Jantzen which Jantzen said were "suggestive" of abuse, although Perez reported them as being "positive" of abuse.[16] As discussed previously, the initial "Information" filed against Gausvik on July 12, 1995 charged him only with sexual abuse of Troy. It was not until after the August 16, 1995 interviews with Travis and Delilah that the Information was amended to add charges of sexual abuse involving

Travis and Delilah. Gausvik was never charged with abusing any of the Everett children.

Travis was interviewed on August 16, 1995 with Perez, Carrow and Chelan County Deputy Prosecutor Fore present. Carrow's notes suggest this interview was conducted by Fore. (Ex. E to Declaration of Patrick McMahon). At this interview, Travis finally made some accusations that he had been sexually abused by his mother (Barbara Garaas) and by Ralph Gausvik. He also made statements that Troy and Delilah had been abused by Barbara Garaas and Ralph Gausvik. (Plaintiff's Ex. 11). In his declaration, Travis now has this to say about the interview:

> I ... remember that they were all staring at me, and they made it immediately clear that I was going to make allegations that day. They started asking me questions about my parents almost immediately, telling me that my parents had molested me. I denied these allegations. They would take turns asking me questions. I would deny that my parents did anything. To get them off the subject, I made up some stuff about Phillipe again. When I continued to deny that my parents had done anything, one of them told me that the Doctor's exam was suspicious, and that I needed to stop lying and tell the truth. They told me I was not in trouble. I sure felt like I was though. It felt again like I was a suspect being interrogated. They just wouldn't take no for an answer.
>
> I started to make stuff up about my mom molesting me. They weren't satisfied so I just gave up. I made some stuff up about my dad as well. Then

---

16. In his August 10, 1995 "Affidavit of Probable Cause," Chelan County Deputy Prosecutor Fore relied on Perez's June 5, 1995 interview with Troy, but he also relied on Jantzen's medical examinations of the children which he (Fore) accurately reported as "suggestive but not specific for sexual abuse." (Plaintiff's Ex. 32).

they wanted more so I said some stuff about the Everett's house and seeing orgies going on there. In truth, I was never molested by my parents or anyone. I never saw my parents or anyone molest anyone. I never saw any orgies involving kids.

(Declaration of Travis Garaas, Paragraphs 10 and 11).

Delilah was also interviewed on August 16, 1995. Kate Carrow conducted the interview with Fore and Perez in attendance. Carrow testified at Gausvik's trial that Delilah had divulged during this interview that her father had sexually abused her. (Exs. C and D to Declaration of Patrick McMahon).

Travis (currently age 21) is the only one of the children to have recanted his allegations of abuse by Ralph Gausvik. There is no indication that either Troy (currently age 18), or Delilah (currently age 14), have recanted. There are no declarations from Troy and Delilah alleging they were coerced by Perez to accuse their parents of abuse. Each of the children testified against Gausvik at his trial in late October/early November 1995. (Ex. T to Declaration of Patrick McMahon).

 Plaintiff offers evidence of children, other than Travis, Troy and Delilah, who claim Perez coerced or attempted to coerce them into making false allegations of abuse. These other children include Jessika Still (Ex. 93), Melinda Everett (Exs. 94 and 137)[17], Clarissa Chavez (Ex. 96), Richard Everett (Exs. 109 and 110), Shawn Everett (Ex. 111), Kimberly Allbee (Ex. 112), Sarah Doggett (Ex. 113), Melissa Henkel (Ex. 115), and Amber Doggett (Declaration of Amber Doggett). While defendants object to this evidence as improper character evidence, it seems to this

court it is admissible, at least for summary judgment purposes, under Fed.R.Evid. 404(b) as proof of either motive, intent, plan, or knowledge by Perez. Having reviewed this evidence, some of it does not seem particularly persuasive that Perez coerced allegations of abuse, but that is for a jury to decide.

Plaintiff has retained psychologist Phillip Esplin, Ed.D., as an expert witness. Dr. Esplin says he has been employed as a consultant by a number of police departments and state agencies to assist in training police officers on proper forensic interview techniques. Esplin opines that "on a more probable than not basis, to a reasonable degree of certainty that the child interview techniques that Perez employed in the *Gausvik* [case] were so coercive and abusive that Perez, and his supervisors who reviewed his reports, knew or should have known, that the interviews would yield false information."

Esplin asserts, based on his review of the record, that there was "interviewer" bias in both Delilah's May 30, 1995 interview by Perez and Troy's June 5, 1995 interview by Perez; that Perez repeatedly asked the children within a single interview whether they had been abused in order to finally get an answer he wanted (citing again as an example, Delilah's May 30 interview); that Perez subjected the children to repeated interviews to finally get the answers he wanted; that Perez during his interviews used an emotional tone which was harsh and intimidating; that Perez rewarded the children when he got answers he wanted, and punished them when he did not (i.e., Troy was "denied" a break before making allegations against his parents; after he made those allega-

**17.** Melinda testified that Perez used physical violence against both her and Donna, her sister (i.e., Perez allegedly held Donna down and subjected her to cold showers, Ex. 94 at p. 17). There is, however, nothing in the record from Donna recanting any of her allegations of abuse.

tion, the interview was terminated and he was taken to McDonald's for lunch); that Perez used his "high status" as a police officer to influence the children[18]; and that the accuracy of Perez's reports must be questioned since he did not mention questioning Travis on May 30, 1995, although Travis asserts that Perez did question him on that date at the Gausvik/Garaas home.[19]

Esplin concludes that "the police work and interview techniques exhibited by Mr. Perez and the Wenatchee Police Department in the Gausvik case are among the most egregious I have ever seen in my career," and the "so-called Tour of Homes, along with the follow-up extended interviews is one of the most abusive circumstances I have seen in my professional career."

The Ninth Circuit, of course, has indicated that disbelieving an initial denial of abuse and continuing with aggressive questioning of a child cannot, without more, support a deliberate fabrication of evidence claim. The circuit has also said that the "Tour of Homes" is not per se an abusive or coercive investigative technique that one should know would yield false information. Furthermore, Dr. Esplin was not present for any of these interviews and his assessment is based merely on his looking at pieces of paper. There is no indication that Esplin has spoken to any of the Garaas children or any of the other children involved in the various Wenatchee Sex Ring investigations. The only conceivable basis for Esplin to say that Perez used an emotional tone during his interviews with the Garaas children which was harsh and intimidating would be the Declaration of Travis Garaas, but that is not among the documents Esplin indicates he reviewed. (Ex. B to Esplin Declaration). Esplin indicates that he did review declarations and excerpts of testimony from children, other than the Garaas children, who were involved in the Wenatchee Sex Ring investigations.

■ Defendants contend Esplin's opinion is improper because he is opining about the credibility of the Garaas children, effectively saying they did not tell the truth under questioning by Perez. Defendants cite a Second Circuit case, *U.S. v. Scop*, 846 F.2d 135, 142 (2nd Cir.1988), in support of their position ("expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony" because "the credibility of witnesses is exclusively for the determination by the jury . . . ."). Esplin does not directly opine the Garaas children could not have been telling the truth when they made statements they had been sexually abused, nor, of course, should he. That is for a trier of fact to determine. As long as Esplin is otherwise qualified and his methodology is reliable, however, this court believes he can offer an opinion about the nature of Perez's questioning of the children. A jury can

---

**18.** Perez says in his incident report dated May 30, 1995 that Kate Carrow introduced herself and Perez as "safety people." (Plaintiff's Ex. 4 at p. 2).

**19.** In his incident report dated May 30, 1995 (Plaintiff's Ex. 4), Perez does not mention speaking with Travis at the Garaas/Gausvik home. In her notes from that date, however, Kate Carrow does mention it, but says it was not a "formal interview." According to Carrow:

Bob said Travis told him that his parents drank with the Everetts on occasion but denied any abuse/ although he only talked to him very briefly. Travis was crying when confronted about what he knew about any abuse related incidents or victimization not a formal interview.

(Ex. C to Declaration of Tyler K. Firkins in Support of Plaintiff's Motion for Contempt).

consider that opinion in determining whether the children were being truthful. Defendants do not challenge Esplin's qualifications or his methodology. Essentially what is at issue is the weight to be accorded Esplin's opinion, particularly in light of the Ninth Circuit's opinion in *Devereaux*.

█ As should be apparent from the foregoing discussion, there are serious questions about the probative value of some of plaintiff's evidence in establishing that Perez fabricated evidence against plaintiff, particularly so in light of the seemingly stringent test articulated by the Ninth Circuit in *Devereaux*. It is a very close call, but viewing the evidence as a whole and in the light most favorable to the plaintiff, this court finds there is a genuine issue of material fact whether Perez used investigative techniques that were so coercive and abusive that he knew or should have known those techniques would yield false information regarding Gausvik. In that regard, the court emphasizes the Declaration from Travis Garaas, along with the statements of some of the other children who were interviewed by Perez (i.e., the Everett children, the Doggett children, Clarissa Chavez).

### b. Qualified Immunity

█ Because there is a genuine issue of material fact whether Perez deliberately fabricated evidence, he is not entitled to qualified immunity at this time. Qualified immunity shields § 1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court recently clarified this inquiry in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). To decide whether a defendant is protected by qualified immunity, a court must first determine whether, "taken in the light most favorable to the party asserting injury, ... the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 2156, 121 S.Ct. 2151. If the plaintiff's factual allegations do add up to a violation of the plaintiff's federal rights, the court must proceed to determine whether the right was "clearly established," or in other words, whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstance aware that what he was doing violated that right. *Id.*

█ Here, the constitutional right in question, per the *Devereaux* case, has always been "clearly established" (due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated is "virtually self-evident"). 263 F.3d at 1074–75. Therefore, if the facts are as alleged by plaintiff Gausvik, a reasonable officer in Perez's circumstance would have been aware that he was violating that right. The determination of what conduct underlies an alleged constitutional violation— what the officer and the claimant did or failed to do—is a determination of fact. Where there are disputed issues of fact as to what the officer knew and did or failed to do, and what the plaintiff did or failed to do, summary judgment cannot be granted on the basis of qualified immunity. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993).

### c. Plaintiff's Motion for Partial Summary Judgment Re Liability of Perez (Familial Association)

Plaintiff moves for summary judgment against Perez, alleging there is no genuine issue of material fact that he had no basis whatsoever for removing the Garaas children from their home on May 30, 1995 and therefore, that plaintiff was deprived of his

constitutional right to live together with his children without governmental interference (familial association). According to plaintiff, the "only allegation that had been secured against [him] as of May 30, 1995, was the finger pointing to his home by Donna Everett" and "[b]y the time Perez got around to investigating Mr. Gausvik, more than two months after [Everett's] allegation, the prosecutor's office and the Wenatchee police department had unwritten policies not to initiate criminal proceedings based upon the uncorroborated testimony of Donna Everett, [because] of her unreliability." Plaintiff asserts it is indisputable that the "seventy-eight (78) day delay between receiving the allegation by Donna Everett during the 'tour of homes' [March 13, 1995] and the commencement of the Gausvik investigation [May 30, 1995] demonstrates that no reasonable jury could determine that such a delay constitutes an emergent situation, allowing the seizure of the Garaas children without a court order." Furthermore, plaintiff asserts that "given the credible denials of abuse by Delilah and Travis Garaas, even after improper interrogation by Perez, no reasonable suspicion of immediate threat existed justifying a warrantless seizure of the children."

 Parents and children have a well-elaborated constitutional right to live together without governmental interference. *Wallis v. Spencer*, 202 F.3d 1126, 1136–37 (9th Cir.2000), citing among others, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency. *Id.*, citing among others, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Officials may remove a child from the custody of his/her parents without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury. *Id.* at 1138.

 Perez contends Gausvik cannot assert any constitutional right to familial association regarding Travis because Travis is neither Gausvik's biological or adopted son. Perez, however, offers no legal authority for that proposition. Travis states Ralph Gausvik, although not his birth father, is "the only father I knew for my whole life." (Declaration of Travis Garaas). According to Ralph Gausvik, he was present for Travis' birth; acted as his father at all times, other than when he was incarcerated; dealt with Travis' school issues, medical issues, and legal issues; has always considered Travis his son; and has always been at least Travis' custodian and guardian and "all legal entities recognized [him] as such." (Declaration of Ralph Gausvik).[20]

Plaintiff asserts Washington law recognizes the importance of his rights as Travis' psychological parent. The right plaintiff asserts, however, is a federal constitutional right and therefore, federal law is controlling on this question. In any event, federal law appears consistent with Washington law.[21]

---

**20.** Gausvik does not explain exactly how under Washington law he would be considered Travis' legal guardian or custodian. The dependency proceedings regarding Travis involved only Travis' mother, Barbara Garaas (Ex. K to Declaration of Patrick McMahon).

Parental termination proceedings regarding Travis were not instituted against Gausvik.

**21.** In *In re Marriage of Allen*, 28 Wash.App. 637, 626 P.2d 16 (1981), the Washington Court of Appeals affirmed a trial court's decision in a dissolution proceeding awarding

A family can be established by more than mere biological ties. Family units are forged on the emotional attachments that derive from the intimacy of daily association as well as from blood relationships. *Smith v. Organization of Foster Families for Equality & Reform ("OFFER")*, 431 U.S. 816, 843–44, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). "No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." *Id.* at 844, 97 S.Ct. 2094. It is the justified expectation of enduring companionship that is the benchmark for protected liberty interest in the family. The Constitution protects only those social units that share an expectation of continuity justified by the presence of certain basic elements traditionally recognized as characteristic of a family. *Wooley v. City of Baton Rouge*, 211 F.3d 913, 921 (5th Cir.2000), citing *Smith v. OFFER.*

At the time that Travis was taken from the Garaas/Gausvik home on May 30, 1995, he had lived with Ralph Gausvik for all 14 years of his life. Perez has offered nothing to suggest there was not a strong emotional attachment between Travis and Ralph Gausvik. All Perez has asserted is that Travis is not the biological or adopted son of Gausvik. In the absence of a more persuasive argument by Perez, accompanied by some legal authority, this court finds as a matter of law that Gausvik has a federal due process right to familial association with Travis. If a jury finds that right was violated, it can determine exactly how strong their relationship was in assessing the amount of damages to which Gausvik is entitled.

The "Temporary Custody Notification" dated May 30, 1995 which Barbara Garaas signed, stated the Wenatchee Police Department ("W.P.D.") had placed the Garaas children in temporary custody of CPS because of "[a]llegations of sexual abuse [and] failure to protect/ongoing investigation." Kate Carrow signed the notice on behalf of CPS. (Plaintiff's Ex. 80). RCW 26.44.050 provides that "[a] law enforcement officer may take or cause to be taken, a child into custody without court order if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order pursuant to RCW 13.34.050."

Perez submits a declaration from Kate Carrow in which she states:

Upon arrival at the Garaas home, I noticed that the home smelled unclean and [was] extremely cluttered and unsanitary. The bathroom was very filthy and smelled especially bad. The kitchen sink was stacked full of dishes and none of the Garaas children were properly clothed. In addition, Delilah's hair was matted to the point that it required two hours to comb out.

While there was suspicion of sexual abuse and failure to protect, based on Delilah's [May 30, 1995] interview, and based on my years and experience as a CPS caseworker, I requested Detective Perez to place the children into protective custody based on the obvious signs of neglect that I witnessed at the Garaas home. The parental neglect issues were my primary concern on May 30, 1995, and the basis for requesting protective custody of the children.

Perez also submits a declaration from Micki Reyes who took the Garaas children

custody of a child to a stepparent as opposed to the biological parent. The court found the "psychological relationship" between the stepparent, her family, and the child was "equivalent to that of a natural family entity." *Id.* at 648, 626 P.2d 16.

into foster care on May 30, 1995. Reyes, who says she went to the Gausvik/Garaas house on May 30, 1995 to pick up the children, corroborates Carrow's statements about parental neglect (i.e., the house was filthy and smelled; Christa who was four years old was still on a bottle and her teeth were rotten; Troy did not have shoes properly fitted for his feet, etc.).

Plaintiff asserts that even if the testimony about neglect is true, it was still insufficient to support probable cause to seize the children without a court order because the alleged neglect was not serious enough under Washington law.[22] Moreover, plaintiff contends Carrow's sworn statement in her declaration that "parental neglect" was the basis for requesting protective custody of the children is false. To that end, plaintiff has filed a motion seeking sanctions against Perez for what he says is Carrow's bad faith affidavit.[23] Plaintiff contends the "Temporary Custody Notification" dated May 30, 1995 refutes Carrow's declaration, as do her notes (aka "Service Episode Record") from that date (Plaintiff's Ex. C to Declaration of Tyler K. Firkins in Support of Plaintiff's Motion for Contempt).

Certainly, the "Temporary Custody Notification" signed by Carrow specifically refers only to sexual abuse. There is no mention of general neglect. Carrow's notes from May 30 and 31, 1995, however, mention that the home smelled unclean, there was clutter about, the bathroom was filthy and smelled especially bad, the kitchen sink was full of dirty dishes, the family had CPS involvement due to "neglect" when they lived in North Dakota, the foster parent (Reyes) was provided funds to purchase clothes for the children since there was not "adequate clothing" at the time of their removal, the hair of one of the children was matted which took two hours to get it out, and Christa's teeth were rotten. Carrow's declaration is not obviously inconsistent with what she earlier stated in her notes. *Van T. Junkins & Assoc. v. United States Indus., Inc.*, 736 F.2d 656, 657 (11th Cir.1984) (Rule 56(g) sanctions can only be imposed where there is direct evidence of a prior inconsistent statement).[24] Whether that was the "primary" reason she asked Perez to place the children in protective custody and whether that was also Perez's "primary" reason for

---

**22.** RCW 13.34.030 states that a "dependent child" is one who is "abused or neglected." RCW 26.44.020(12) defines "child abuse or neglect" to mean:
> ... the injury, sexual abuse, or negligent treatment or maltreatment of a child by a person who is legally responsible for the child's welfare under circumstances which indicate that the child's health, welfare and safety is harmed thereby. An abused child is a child who has been subjected to child abuse or neglect as defined herein.

RCW 26.44.020(15) defines "negligent treatment or maltreatment" as "an act or omission that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to the child's health, welfare, and safety."

**23.** Fed.R.Civ.P. 56(g) provides:
> Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**24.** In her declaration, Carrow refers to a Shelter Care Hearing which took place on June 15, 1995 regarding the Garaas children. She says she testified regarding "neglect and failure to protect" and asserts the court ruled there was "neglect by cumulative effect." There is, however, nothing in the record from the court which conducted the Shelter Care Hearing.

doing so is a question for a jury to decide.[25]

Furthermore, there is enough evidence in this record from which a jury could reasonably infer that as of May 30, 1995, Perez had enough evidence of sexual abuse to justify taking all of the children into protective custody without a prior court order. Delilah Garaas was interviewed on May 30, 1995 before she and her brothers were removed to foster care. Although Delilah did not specifically accuse her parents of abuse during that interview, Carrow's notes of the interview indicate Delilah stated her mother told her not to talk about "private part touching." Delilah also said she had seen the Everett children get touched on their privates by their mother and father (Harold and Idella Everett) at the Everett home. Delilah indicated that her mother told her not to talk about this (the touching by the Everetts) and also indicated that her mother and her had gone to visit the Everetts in a bedroom located in the Everett home. Carrow wrote in her notes that:

> Info. of protective custody to do investigation further & risks posed at this point since there was now a clearer suspicion of abuse—parental involvement. Still alleged—Based on Delilah's statements of secrecy implied.

That statement is consistent with the reasons set forth in the May 30, 1995 "Temporary Custody Notification" for placing the Garaas children in protective custody: "Allegations of sexual abuse and failure to protect/Ongoing investigation."

Whether Perez coerced Delilah into making allegations of sexual abuse during the May 30, 1995 interview is a genuine issue of material fact. Likewise, what Perez and Carrow related about that interview raises an issue of material fact whether there was a sufficient basis for suspecting all of the Garaas children were victims of sexual abuse by someone so as to justify taking them into temporary custody. The fact Delilah said nothing specific about sexual abuse by her father or mother during the May 30 interview does not conclusively establish Perez's liability for removing the children from their home on that date.

Prior to May 30, 1995, Perez's foster daughter, Donna Everett, had identified the Garaas/Gausvik house as a place where sexual abuse occurred. Perez says Donna told him Gausvik and Garaas abused their own children, as well as the Everett children. (Plaintiff's Ex. 4). Plaintiff asserts that Perez simply had no basis whatsoever for relying on what Donna Everett told him, noting that the Chelan County Prosecuting Attorney at some point adopted a policy not to initiate criminal proceedings based on the uncorroborated testimony of Donna Everett. (Plaintiff's Exs. 79(b), Fore Depo. at pp. 28–30 and Ex. 80(b), Riesen Depo. at pp. 111–12).[26] Delilah's May 30, 1995 interview, however, arguably supplied some corroboration. A jury

---

**25.** The dependency petition filed on June 6, 1995 in Chelan County Juvenile Court alleged that "[t]he children smelled badly, wore [unkempt] clothing and Delilah's hair was seriously matted ... all from lack of proper care/hygiene and neglect." (Plaintiff's Ex. 82). As previously discussed, the final orders on dependency entered on December 1, 1995 with regard to each of the children included findings that Delilah's hair was excessively dirty and matted; Christa's teeth were rotting and required extensive dental care; and Troy had not been wearing his leg/foot brace and needed surgery for his disability.

**26.** Fore testified the policy was the result of a concern about Everett's status as the foster daughter of Perez. Riesen says his concern was that because there was no medical evidence to support Everett's allegations against certain individuals, he did not want to go to trial based simply on her word versus the word of an accused.

should decide after hearing the evidence whether based on Donna Everett's accusations and Delilah's May 30 interview, Perez had sufficient reason on that date for placing the Garaas children in temporary protective custody.

This conclusion is also supported by the fact that Barbara Garaas and Ralph Gausvik signed a Voluntary Placement Agreement on May 31, 1995 agreeing that their children be placed in the care and supervision of DCFS (Division of Children and Family Services) until at least June 14, 1995. (Plaintiff's Ex. 81). Plaintiff asserts that he and his wife were coerced into signing this agreement, but Carrow claims it was voluntary, as did Perez, in his May 30, 1995 incident report. In his report, Perez says he advised Barbara Garaas of her constitutional rights when he arrived at the Garaas/Gausvik home on May 30, 1995. (Ex. 4 at pp. 4–5).[27] Whether Garaas and Gausvik voluntarily signed the placement agreement is another issue a jury should decide.

■■■■ Based on the foregoing, there is sufficient evidence making for a genuine issue of material fact whether Perez on May 30, 1995 had reasonable cause to believe the Garaas children were in imminent danger of serious bodily injury and that placing them in temporary custody without prior judicial authorization was reasonably necessary to avert that specific injury. This issue of material fact precludes awarding qualified immunity to Perez for an alleged violation of plaintiff's clearly established constitutional right to familial association.[28]

### 5. Individual Liability—Badgley and Tilly

■■■■■ Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates. *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987).[29] A supervisor cannot be held liable under § 1983 on a respondeat superior basis. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). An official who has failed to prevent a constitutional violation by inadequately training, supervising or investigating his subordinates may be liable under § 1983 if the plaintiff shows: 1) the supervisor possessed the requisite culpable state of mind; and 2) a causal connection between the supervisor's action or inaction and the infliction of the alleged constitu-

---

**27.** On June 2, 1995, Barbara Garaas and Ralph Gausvik revoked the Voluntary Placement Agreement and requested to have their children returned home in 72 hours. On June 5, 1995, the Wenatchee Police Department placed the children back into protective custody. Of course, on June 5, Troy Garaas stated in an interview with Perez that both of his parents had sexually abused him and his sister Delilah.

**28.** Perez says that if plaintiff is entitled to any damages for the removal of his children from his home on May 30, 1995, those damages should be limited to the period between their removal and the orders of dependency entered on December 1, 1995. If plaintiff is not collaterally estopped or judicially estopped from maintaining the litigation before this court, as the court has concluded, there is no basis for limiting the period for which plaintiff can recover damages. Once again, by December 1, 1995, plaintiff had already been criminally convicted of sexually abusing his children and in light of that, there was simply no way he was going to convince a judge that his children were not "abused or neglected." See discussion of Collateral Estoppel/Judicial Estoppel *supra*.

**29.** To the extent plaintiff alleges Badgley and or Tilly implemented an official policy or custom that inflicted the alleged constitutional harm, that is an allegation against them in their official capacities. This is discussed below regarding municipal liability. A suit against individuals in their official capacities is the equivalent of a suit against the municipality itself. See *Larez v. City of Los Angeles*, 946 F.2d 630, 645–46 (9th Cir.1991).

tional harm. *Redman v. County of San Diego*, 942 F.2d 1435, 1446–47 (9th Cir. 1991) (en banc), cert. denied 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). Culpability is established by showing the supervisor was deliberately indifferent to "acts by others which the [supervisor] knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 1447. When applied to determine the culpability of a supervisor who "failed to act to prevent" a constitutional injury, the deliberate indifference standard is objective in nature. *Id.*

According to plaintiff, Badgley and Tilly permitted Perez to "employ improper methods to extract the accusations that would be used to convict [plaintiff]." Plaintiff alleges Badgley and Tilly were aware of Perez's actions and condoned them. Plaintiff says Badgley allegedly assigned a Captain Murray to investigate citizen complaints of abuse by Perez, but there is no evidence that an investigation took place. Plaintiff also claims Badgley should have known about Perez's coercive tactics because Badgley read Perez's reports.

Plaintiff singles out several exhibits as proof of Badgley and Tilly's alleged culpability. Plaintiff's Ex. 148 is a copy of a March 28, 1995 letter from Tilly to a Robert Kinkade. Tilly acknowledges receiving a letter from Kinkade containing a list of complaints against Perez. Tilly states he contacted Badgley to investigate the complaints and Badgley advised that Captain Murray had completed an earlier investigation of Perez which did not sustain Kinkade's complaint. Tilly stated he would ask the police chief (Badgley) to investigate any "new" issues.

Kinkade alleged that Perez had used improper interview techniques with regard to Kimberly Allbee. Captain Murray assigned a Sgt. Magnotti to review Kinkade's complaint. Kinkade supplied Magnotti with a videotape of Allbee being interviewed by a George Wimberly in which Allbee recanted the abuse she had previously disclosed to Perez. In his March 17, 1995 report to Badgley (Ex. N to Supplemental Declaration of Patrick McMahon), Murray indicated that Magnotti, who is "very knowledgeable with established interview techniques and legal requirements regarding the reporting and investigation of child abuse cases," reviewed the videotape and concluded Wimberly used improper techniques in interviewing Allbee. Magnotti also reviewed Perez's investigative reports and spoke with the CPS caseworker and the school principal who were present during Perez's interview of Allbee. Magnotti did not find any improper interview techniques on the part of Perez. Murray indicated he had spoken with Magnotti about his findings and based on Murray's own knowledge of acceptable interview techniques in child abuse cases, Murray agreed that Kinkade's complaint could not be sustained.

The court fails to see how Kinkade's complaint and the investigation thereof is probative evidence of either Tilly or Badgley being aware of and condoning Perez's alleged unconstitutional actions regarding Mr. Gausvik and the particular circumstances of his case.

Plaintiff's Ex. 149 consists of excerpts from Badgley's testimony at an earlier civil trial involving the Wenatchee Sex Ring. Badgley discusses reviewing reports from officers as part of his regular staff meetings. He also discusses his knowledge that Donna Everett was the foster daughter of Perez and that nevertheless, Perez was not removed from the investigation after Everett made her disclosures regarding alleged abuse. Badgley testified he was aware of media criticism that Perez was coercing allegations of abuse.

Plaintiff does not explain how any of this raises a genuine issue of material fact that Badgley was aware of and condoned Perez's alleged unconstitutional actions regarding Mr. Gausvik in particular. Moreover, it is not reasonable to assign supervisory liability to Badgley merely by virtue of his reading Perez's reports. Plaintiff suggests the existence of coercive and abusive investigative techniques was manifest from the face of those reports so that Badgley knew or should have known Perez was deliberately fabricating evidence against Gausvik. That is simply too great a stretch. Furthermore, the court sees no reason why Badgley was supposed to accept the media reports at face value. And while the fact that Donna Everett was Perez's foster daughter was certainly a concern, that should not necessarily have led Badgley to believe Perez had coerced or was going to coerce allegations of abuse from the Garaas children.

Plaintiff also cites to an Ex. 103 which is a 1997 "fitness for duty" evaluation from a clinical psychologist to the Human Resource Director of the City of Wenatchee discussing Perez's mental condition. Plaintiff does not explain how this document evidences either Badgley's or Tilly's actual or constructive knowledge that in 1995 Perez was inflicting alleged unconstitutional harm on the plaintiff. It is not readily apparent from the document how it

is supposed to have any probative value in that regard.[30]

▬ Plaintiff has filed a Motion to Supplement his Summary Judgment Response (Ct.Rec.221). Assuming this supplemental proof is intended to establish supervisory liability on the part of Badgley and Tilly, it fails to do that because here again, the proof offered does not establish any causal connection between Badgley's and Tilly's alleged action or inaction and the infliction of the alleged constitutional harm to Mr. Gausvik in particular.[31] All of the proof involves investigations other than the investigation of Gausvik. The deposition testimony from Murray and Badgley offered by plaintiff does not establish any causal connection between what Badgley allegedly did and did not do and the alleged constitutional harm suffered by Gausvik. Even more clearly, it does not establish such a connection with regard to defendant Tilly.

There is no evidentiary support for plaintiff's allegations that Badgley and Tilly somehow personally participated in the alleged constitutional harm which Perez perpetrated upon the plaintiff. There is no evidentiary support for plaintiff's allegations that something Badgley and/or Tilly did or did not do caused the alleged constitutional harm suffered by plaintiff. There is no evidence that Badgley and/or

---

**30.** In 1997, Perez was diagnosed with Post–Traumatic Stress Disorder by a Dr. James Goodwin (Plaintiff's Ex. 102). Dr. Goodwin suggested the disorder started as early as 1994 which would have been prior to the Gausvik investigation in 1995. Nevertheless, there is no evidence that Badgley or Tilly would have been aware of this mental condition in 1995. Apparently in 1991, Perez received an evaluation which was somewhat critical of him ("live wire ready to go off") (Plaintiff's Ex. 103), but a 1989 evaluation (Ex. 150) stated that Perez's "outward appearance is excellent; excellent public relations with youngsters; excellent potential;

good sense of humor; good officer survival instincts." The criticism contained in the 1991 evaluation is of no probative value in establishing that either Badgley or Tilly had knowledge that Perez had a mental problem in 1995.

**31.** Plaintiff merely submits the proof. There is no accompanying memorandum explaining how the proof is supposed to establish supervisory liability, or municipal liability for that matter. For that reason alone, the court would be justified in disregarding this supplemental proof.

Tilly were deliberately indifferent to alleged unconstitutional conduct by Perez perpetrated upon Gausvik. Therefore, the court will grant summary judgment on plaintiff's § 1983 claim in favor of Badgley and Tilly in their individual capacities.

### 6. Municipal Liability—City of Wenatchee [32]

 A municipality or governmental entity cannot be found liable under 42 U.S.C. § 1983 on a *respondeat superior* theory. *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability must be established in one of the following ways: 1) by proving that a "city employee committed the alleged constitutional violation pursuant to a formal governmental policy or longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" 2) by establishing that the "individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" [33] or 3) by proving that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore,* 979 F.2d 1342, 1346–47 (9th Cir.1992). It must also be proven that one of the above circumstances was the cause in fact and the proximate cause of the constitutional deprivation. *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir.1996).

 Municipal liability results where a policy or custom is the moving force behind the constitutional violation as compared to supervisory liability, discussed *supra,* where an individual is held liable for his own personal conduct which leads to the constitutional harm. See *Larez v. City of Los Angeles,* 946 F.2d 630, 645–46 (9th Cir.1991).

### a. Training

 A municipality can be held liable under § 1983 for failure to train, supervise or discipline its employees. However, "the inadequacy of training policy may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

 Deliberate indifference may be established by demonstrating a failure to train officials in a specific area where there is an obvious need for training in order to avoid violations of citizens' constitutional rights. Secondly, a municipality may be held responsible where a pattern of unconstitutional conduct is so pervasive as to imply actual or constructive knowledge of the conduct by the policymakers, whose deliberate indifference to the unconstitutional practice is evidenced by failure to correct the situation when the need for the training becomes obvious. *Id.* at 396–97, 109 S.Ct. 1197.

 The deliberate indifference standard pertains to what is necessary to establish that municipal policy is the "moving force" behind a constitutional violation. *Id.* at 388, n. 8, 109 S.Ct. 1197. A plaintiff must identify a particular deficiency in the training program and prove the deficiency was the cause of the constitutional injury. It is not enough to establish that a particular officer was inadequately trained, or

---

**32.** Plaintiff has also named the Wenatchee Police Department as a defendant. For § 1983 purposes, the police department is indistinguishable from the City of Wenatchee.

**33.** Plaintiff nowhere asserts that Perez was a final policymaker.

that there was a negligent administration of an otherwise adequate program, or that the conduct resulting in the injury could have been avoided by more or better training. *Id.* at 390–91, 109 S.Ct. 1197.

To the extent plaintiff is seeking to establish municipal liability based on inadequate training, it appears his assertion is that only Perez was inadequately trained. That is not enough under *City of Canton.*[34] Besides that, the plaintiff essentially assumes something must have been wrong with the training because of the alleged constitutional violation by Perez. Plaintiff does not identify any specific deficiencies in the training Perez received which led to the alleged constitutional violation, nor does he identify any particular training Perez should have received which would have potentially circumvented the alleged violation.[35]

Plaintiff asserts that by 1995 "competent training in conducting interviews of possible victims of child sexual abuse included materials on the deleterious effects of suggestive interviews" and "[c]ertainly no competent program would have taught that it was proper to threaten, frighten, intimidate, or forcibly foist scenarios of abuse impressed on child interview subjects." Plaintiff cannot really be suggesting that Perez was trained to coerce witnesses into making false accusations or that his training did not include an admonition not to coerce witnesses. Indeed, officers do not need any training in order to know that coercion of witnesses or sus-

pects—whether children or adults—is improper. If an officer is absolutely determined to coerce witnesses or suspects into making false accusations or confessions, training will not make any difference.

### b. Ratification (Supervisory Liability in Official Capacity)

To the extent plaintiff alleges that Badgley and/or Tilly, as policymakers, ratified alleged unconstitutional conduct by Perez, that allegation is not supported by the evidence as the court has discussed above in concluding that Badgley and Tilly are not liable in their individual capacities for failing to supervise Perez.[36] Furthermore, while a plausible argument can be made that Badgley, merely be virtue of being the chief of police, was a policymaker with regard to police procedure, tactics, and training, plaintiff does not explain or offer any evidence how Tilly would qualify as a policymaker in those areas.

### c. Destroying Field Notes

Plaintiff's lengthy statement of material facts raises municipal liability arguments which are not discussed in his memorandum of authorities. For that reason alone, those arguments can be disregarded.

For example, plaintiff says the Wenatchee Police Department had a custom of destroying its notes of interviews and Perez followed this custom. Plaintiff, however, does not explain how this custom contributed to the alleged constitutional harm in plaintiff's case. If Perez was truly

---

**34.** See also *Bd. of County Com'r of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 408–09, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

**35.** It is undisputed that Perez received some training in child sex abuse investigations. He attended a three day, twenty-one hour seminar put on for the prosecutors and law enforcement personnel in Wenatchee from December 1, 1993 to December 3, 1993. In May

1994, he attended the five day, forty hour Washington State Criminal Justice Training Course on investigating child abuse.

**36.** Ratification requires, among other things, knowledge of the alleged constitutional violation. *Christie v. Iopa,* 176 F.3d 1231, 1239 (9th Cir.1999). Ratification must be evidenced by an official's "conscious, affirmative choice." *Gillette,* 979 F.2d at 1347.

bent on coercing false allegations of abuse from the Garaas children, would he really have wrote anything down in his personal field notes that was different from what he put in his final report?[37] Plaintiff does not suggest what possible damning information Perez may have destroyed or concealed. Furthermore, the CPS workers who were present during the interviews did take notes which can be compared to what Perez wrote in his final report. Plaintiff cites those very notes in contending that Perez coerced allegations of abuse from the Garaas children.

### d. Summary

The court will grant summary judgment in favor of the City of Wenatchee on plaintiff's § 1983 claim.

### 7. Conspiracy

 A conspiracy in violation of § 1983 requires proof of: (1) an agreement between the defendants to deprive the plaintiff of a constitutional right; (2) an overt act in furtherance of the conspiracy and; (3) a constitutional violation. *Gilbrook v. City of Westminster*, 177 F.3d 839, 856–57 (9th Cir.1999) (en banc).

Because the court is granting summary judgment to all of the named defendants, except Perez, that, by definition, eliminates the possibility of any conspiracy to violate

plaintiff's constitutional rights. Put another way, plaintiff has not offered sufficient proof to raise a genuine issue of material fact that Perez "agreed" with any of the other defendants to deprive the plaintiff of a constitutional right. For reasons set forth above, those other defendants are not liable for any violation of the plaintiff's constitutional rights.

The court will grant summary judgment in favor of all of the defendants on the plaintiff's civil rights conspiracy claim.

### C. State Law Claims

Plaintiff's complaint pleads several claims under Washington state law (false arrest/false imprisonment, intentional and/or negligent infliction of emotional distress, and negligent training and supervision by City of Wenatchee). These are pled under the court's supplemental jurisdiction, 28 U.S.C. § 1367(a).[38]

### 1. Collateral Estoppel/Judicial Estoppel

 For the same reasons collateral estoppel and judicial estoppel do not bar plaintiff's § 1983 claims, discussed *supra,* they do not bar plaintiff's state law claims.

### 2. Statute of Limitations

 Defendants contend all of plaintiff's state law claims are barred by

---

**37.** In that regard, one has to ask how Badgley would have known from Perez's reports that Perez was either coercing allegations of abuse or concealing exculpatory evidence. In his statement of facts, plaintiff says at one point that "Perez does not disclose in his police report that he yelled at Amber [Doggett]." If Perez yelled at Amber, he certainly would not admit that in a police report. In his statement of facts, plaintiff says "Perez never created a police report regarding the physical violence he was using against Donna Everett while she lived with him." Again, it is difficult to fathom that Perez would ever admit to such a thing in a police report authored by him.

**38.** Plaintiff's First Amended Complaint pleads jurisdiction based on diversity jurisdiction (28 U.S.C. § 1332), as well as federal question jurisdiction (28 U.S.C. § 1331). Plaintiff, however, does not assert he is a citizen of a State other than Washington. Indeed, he pleads that he is currently a "resident" of Washington. Plaintiff admits in the First Amended Complaint that each of the defendants is a citizen of Washington. (First Amended Complaint at p. 2). As such, there is no independent basis of federal jurisdiction over plaintiff's state law claims.

the applicable statutes of limitations. According to defendants, since all of the acts of which plaintiff complains occurred between May 30, 1995 (date of interview with Delilah Garaas and date Garaas children removed from home) and November 2, 1995 (date of Gausvik's conviction), the limitations period expired at the latest in December 1998.[39] RCW 4.16.080(2) provides a three year limitation period for personal injury actions. RCW 4.16.100(1) provides a two year limitation period for an action for false imprisonment and for false arrest. *Heckart v. City of Yakima,* 42 Wash.App. 38, 39, 708 P.2d 407 (1985).

■ As discussed above, the prevailing federal law which determines when a § 1983 cause of action accrues dictates that Gausvik's § 1983 action is timely. At first glance, it would seem the same result should obtain for plaintiff's state law claims which arise out of the same alleged conduct giving rise to his § 1983 action. This is because a judgment for plaintiff on any of his state law claims, like a judgment on his § 1983 claims, would seem to imply the invalidity of his criminal convictions. State law, however, not federal law, determines when a state law action accrues. This court has not found any Washington cases which follow the rationale of the Ninth Circuit in *Cabrera v. City of Huntington Park,* 159 F.3d 374 (9th Cir.1998), regarding accrual of civil causes of action which imply the invalidity of a criminal conviction.

■ Under Washington law, the general rule in ordinary personal injury actions is that a cause of action accrues at the time the act or omission occurs. The exception is the "discovery rule" which

states that with regard to certain torts, the injured parties do not, or cannot, know they have been injured and as such, their cause of action accrues when they knew or should have known all of the essential elements of the cause of action. *Estates of Hibbard,* 118 Wash.2d 737, 744–45, 826 P.2d 690 (1992). RCW 4.16.190 tolls the statute of limitations while a person is "imprisoned on a criminal charge **prior to sentencing**." (Emphasis added).

Plaintiff cites antiquated caselaw in an effort to rebut defendants' statute of limitations argument. According to plaintiff, *Nave v. Seattle,* 68 Wash.2d 721, 415 P.2d 93 (1966), stands for the proposition that "[a]n action for false imprisonment accrues at, and the statute of limitations runs from, the termination of the imprisonment." The Washington Supreme Court quoted that statement from the general treatise, *Corpus Juris Secundum,* but even more importantly, *Nave* was decided years before the present version of RCW 4.16.190 came into being which provides that a limitations period is tolled while an individual is "imprisoned on a criminal charge prior to sentencing." Prior to 1993, the statute provided that a limitations period was tolled while a person "was imprisoned on a criminal charge, **or in execution under the sentence of a court for a term less than his natural life ....**" (Emphasis added). This previous version of the statute was consistent with the general rule which the Washington Supreme Court cited to in *Nave.*

Plaintiff also cites *Horn v. Bailie,* 309 F.2d 167 (9th Cir.1962). In that case, the plaintiff brought a § 1983 civil rights action alleging the defendant police officers tricked him into confessing to a murder in 1935 which he did not commit. The plaintiff was convicted and sentenced to life

---

**39.** Plaintiff was sentenced in December 1995 and therefore, time spent in prison prior to sentencing (between November 2, 1995 and December 21, 1995) would not be included in the limitations period. RCW 4.16.190.

imprisonment. In July 1959, he was released from prison by a writ of habeas corpus and in July 1961, he commenced his civil rights action for damages from alleged violation of his constitutional rights. The Ninth Circuit observed that Washington state law provided the applicable statute of limitations which was three years. While plaintiff's civil rights action was brought within three years from his discharge from prison, the question was whether the statute had been tolled during his imprisonment.

Citing the prior version of RCW 4.16.190, the defendants argued that since the plaintiff had been imprisoned "in execution under the sentence of court" for a term of life imprisonment, and not "for a term less than his natural life," the statute of limitations was not tolled. The Ninth Circuit disagreed, finding that since the sentencing court had been without jurisdiction, the sentence was void and plaintiff's imprisonment was not in execution of a sentence, but was "on a criminal charge" and therefore, the statute of limitations was tolled. 309 F.2d at 168. The defendants argued the sentence was not void on its face but merely voidable and that until the sentence was set aside by court action, it remained valid and enforceable. The circuit found such a distinction "inappropriate" because "[w]hether its invalidity appeared on its face or not, it is now well recognized that a sentence obtained through violation of constitutional rights is a nullity." *Id.*

What the Ninth Circuit did in *Horn* was to ignore plaintiff's sentence and rely on that portion of the older version of RCW 4.16.190 which tolled the statute of limitations while plaintiff "was imprisoned on a criminal charge." The current version of RCW 4.16.190 tolls the statute of limitations while a person is "imprisoned on a criminal charge" but only "prior to sentencing." The current version of the statute has also eliminated the language from the prior version that tolling occurs while an individual is "in execution under the sentence of a court for a term less than his natural life."

Plaintiff, apparently recognizing that *Nave* and *Horn* do not provide him with protection from the applicable statutes of limitation, makes a final argument that barring his state law claims "would cause an unjust and unfair result." Plaintiff says that "defendants' argument, if credited, would result in a situation in which an action for negligence, false arrest, interference with custodial relations and outrage could never be successfully litigated by any plaintiff incarcerated for longer than the statute of limitations . . . even when the conviction is ultimately reversed or vacated." While plaintiff's argument may have some appeal as a matter of equity, the simple fact is that there is no law to support it. RCW 4.16.190 says what it says: a statute of limitations is tolled only while an individual is imprisoned prior to sentence.

In December 1998, three years from when he had been sentenced in December 1995, plaintiff's convictions regarding Troy Garaas had been reversed by the Washington Court of Appeals (January 1998). The remaining convictions regarding Travis and Delilah were still intact, however, and in November 1998 plaintiff had been resentenced on those convictions.[40] If plain-

---

**40.** In December 1997, two years from the date when plaintiff had been sentenced, all of his convictions were still intact. Two years is the limitations period for a false arrest/false imprisonment claim.

Although plaintiff's convictions regarding Troy were reversed in January 1998 and he was resentenced in November 1998, the court does not believe there is a viable argument that period would be tolled on the basis that plaintiff was "imprisoned on criminal charges

tiff had filed a lawsuit before December 1998 asserting state law tort causes of action, the defendants undoubtedly would have used plaintiff's then existing convictions as a defense. It is not clear whether plaintiff had filed his personal restraint petition by December 1998. It is possible that a plaintiff who files a civil lawsuit while his criminal conviction remains valid could seek a stay of the civil suit based on the fact that he is continuing to attack the conviction either directly (by appeal) or collaterally (by personal restraint petition) in hopes of having it reversed.[41]

Based on existing state law, the court must conclude that all of plaintiff's state law claims are barred by the applicable statutes of limitation and summary judg-

ment on those claims will therefore, be granted to Perez, Badgley, Tilly and the City of Wenatchee.[42]

## IV. CONCLUSION

The Motion of defendants Perez, Badgley, Tilly and City of Wenatchee (Ct.Rec. 117) is **GRANTED in part** and **DENIED in part**. It is **GRANTED** as to defendants Badgley, Tilly and City of Wenatchee on all § 1983 and state law claims asserted against them. It is also **GRANTED** as to defendant Perez on the § 1983 conspiracy claim asserted against him and all state law claims asserted against him. It is **DENIED** as to defendant Perez on all other § 1983 claims asserted against him.

**JURY TRIAL WILL COMMENCE ON NOVEMBER 12, 2002 at 1:30 p.m. in Spokane.[43] Pre-trial conference will be**

---

prior to sentencing." During that time, plaintiff's other convictions with regard to Travis and Delilah were still intact and therefore, plaintiff was still held on a valid sentence with regard to those convictions, but needed to be resentenced since the total number of convictions had been reduced from six to four. And even if the ten months between January 1998 and November 1998 were tolled, it would not help the plaintiff because the two year statute of limitations on false arrest/imprisonment had already expired in December 1997 and the three year limitation period on everything else would have been pushed back to sometime in late 1999. Plaintiff's complaint was not filed until March 2001.

41. The "discovery rule" is of no benefit to plaintiff. It would be far-fetched to say plaintiff could not or did not know of the basis for his civil claims until June 2000 when all of the charges against him were dismissed.

42. In its prior order granting summary judgment to defendants Chelan County, Barker & Howard, and Jeffrey Barker and Keith Howard (Ct.Rec.134), this court declined to exercise supplemental jurisdiction over the state law claims against those defendants and dismissed those claims without prejudice. The court did so on the basis that it had granted summary judgment to those defendants on all of the claims (§ 1983 claims) over which the court had original jurisdiction. 28 U.S.C.

§ 1367(c)(3). Chelan County did not raise the statute of limitations as an issue in its motion for summary judgment, a motion joined in by defendants Barker & Howard, Jeffrey Barker and Keith Howard.

With regard to defendants Badgley, Tilly, and City of Wenatchee, this court could also decline to exercise supplemental jurisdiction over the state law claims against them on the basis that it is granting summary judgment to them on all of the claims (§ 1983 claims) over which this court has original jurisdiction. The court cannot use that reasoning with regard to Perez because the court is retaining jurisdiction over some of the § 1983 claims against Perez. Nor does the court believe it can or should use any other basis for declining supplemental jurisdiction (novel or complex issue of state law) (28 U.S.C. § 1367(c)(1)), predominate state law claim (28 U.S.C. § 1367(c)(2)), other compelling reasons for declining jurisdiction (28 U.S.C. § 1367(c)(4)). As such, the court believes it needs to make a determination on the merits of the statute of limitations defense with regard to Perez and therefore, should do the same with regard to Badgley, Tilly, and the City of Wenatchee.

43. In its previous order continuing the trial date, the court advised counsel that it would set the trial date for November 12 if that date became available.

November 1 at 11:00 a.m. in Yakima. Trial briefs, proposed jury instructions and proposed voir dire shall be served and filed no later than November 5.

Plaintiff's Motion for Partial Summary Judgment Re Perez (Ct.Rec.130) is **DENIED.**

Plaintiff's Motion for Rule 56(g) Sanctions and/or Order on Contempt (Ct.Rec. 202) is **DENIED.** The motion to expedite hearing on the motion for sanctions and/or contempt (Ct.Rec.199) is **DISMISSED** as moot.

Plaintiff's Motion to Supplement Summary Judgment Response (Ct.Rec.221) is **GRANTED.** The motion to expedite hearing on the motion to supplement (Ct.Rec. 223) is **DISMISSED** as moot.

Because of the court's summary judgment ruling, plaintiff's Motion for Order Establishing City's Obligation to Pay Punitive Damages Awarded Against Perez Due to Conflict of Interest (Ct.Rec.98) is rendered moot and is therefore, **DISMISSED.**

The District Executive shall **VACATE** the previously entered judgment re defendants Chelan County, Barker & Howard, Jeffrey Barker and Keith Howard (Ct.Rec. 135) on the basis that said judgment was entered prematurely. The order granting summary judgment in favor of those defendants (Ct.Rec.134), however, remains valid.

**IT IS SO ORDERED.** The District Executive is directed to enter this order and forward copies to counsel.